Mr. Bendick. Good afternoon. Good afternoon, Your Honors. Good afternoon, Counsel. May it please the Court. My name is Christopher Bendick from the Office of the State of the Appellate Defender, and I represent the Appellant Jeremy Green before you today. I intend to argue both substantive issues in the brief today, starting with the Fourth Amendment issue. Acting on a mere hunch, Joliet police officers stopped two cars, a Honda minivan and a Chevy Monte Carlo, to, quote, check for occupants, end quote, so they could, quote, know who was in, end quote, the cars. Because the officers possessed neither reasonable suspicion nor probable cause of illegal activity to stop the minivan that Jeremy Green was a passenger in, they violated his Fourth Amendment rights. The trial court erred in granting the state's motion for a directed finding on Jeremy's motion to quash arrest and suppress evidence. Because the evidence from the illegal seizure was admitted against Jeremy at his trial, his conviction must be reversed and the case remanded for a new trial absent any illegally seized evidence. Now, in order for Officer Ruff's seizure of Jeremy… What was the illegally seized evidence? Starting with the blood on his shirt, any blood evidence that was in the car, going forward from that, any of the statements that were given at the station. In order for Officer Ruff's seizure of Jeremy to have been justified from its inception, the situation confronting the officers that evening must have been so far from the ordinary that any confident officer wouldn't be expected to act quickly. However, Lieutenant Reed here admitted that they had no probable cause to arrest Jeremy that evening, so the state's seizure of Jeremy must rest alone on reasonable suspicion. However, the detectives admitted they had no idea who the occupants of either of these vehicles were before ordering the seizure. However, all the detectives admitted they didn't even see who entered any of these cars. They had no idea who the occupants were. Well, what does the reasonable suspicion go to? The occupants in the car, or what? It goes to the reasonable suspicion that Jeremy was involved in criminal activity, in fact. So we don't even have that in this case, and we don't know who was even in these cars either. Well, okay, but reasonable suspicion could be that a perpetrator or something is in a car. Would that be sufficient? Well, A, we do not concede that there was reasonable suspicion to even detain Jeremy. Well, let's not talk about Jeremy. Let's just talk about searching a car, stopping a car. So in this instance, this is a case where we have just an unknown offender fleeing from the scene. This is three and a half miles away from the murder scene, three and a half hours afterwards. So this is not in temporal proximity to the offense, nor in distance proximity to the offense. This is three and a half hours away, in an urban area, far away from the crime scene. So this is not like those cases where we've testified. Okay, you're not saying that the police cannot throw up a roadblock. No, no, I'm not saying that at all. I guess that's the word I was looking for. No, I mean, no, I'm not saying that at all, Your Honor. I'm saying in this instance, the officers stopped two unknown vehicles, not knowing who the occupants were, and that violated Jeremy Green's Fourth Amendment rights, who was inside the minivan that was legally stopped. So, Mr. Bendick, I just want to be sure about a couple of things. Sure. Brittany was murdered, right? Yes, she was stabbed to death. Okay, and when they were doing their investigation, they talked to the family members and some friends, and they all said that your client had threatened her in the past, and there had been incidents of domestic violence, or there had been domestic incidents in the past, and they identified four possible places that he'd been connected with where he might have gone to flee. Is that accurate? I think the accurate statement before the seizure is that they only spoke to family members. I think it was the parents of Brittany, and that there may have been threatening text messages or phone calls. We don't know how close in proximity those were to Brittany's death. We don't know when they broke up on the record. We don't know how close in time to the seizure or to the offense that occurred. You are right that there were four addresses that were associated with Jeremy. Now, the record does not say that Jeremy lived at any of those addresses. It's only that he was associated with those addresses. And the purpose of identifying that association was to say there are places where he might have gone if he was trying to escape. I believe that the officers were sent out to try to talk to Jeremy. Now, Lieutenant Reed obviously admitted that there was no probable cause. He didn't say that there was also reasonable suspicion to stop Jeremy. He would have told the detectives that if they had reasonable suspicion to seize Jeremy had they seen him. They were sent out to talk to Jeremy to try to find him. It doesn't mean that they had, well obviously they didn't have a probable cause. It doesn't mean that they had reasonable suspicion either to stop Jeremy. Okay, but they had, they sent police then, I'm just trying to make sure that I have the facts right. So they sent police officers to all four of the locations. The record's a little unclear on if just the three officers were going to go to all four addresses or if it was going to be four different sets of detectives. But I know that the detectives were heading out to see all four addresses. Okay, and so the detectives that were witnesses here went to the address that was his sister's house, right? They went to one of the four associated addresses. And they found then two cars left from that address. That is not exactly, it depends on which detective's testimony you believe. First they arrived at the address, 1018 Summit. They did not see any of the two vehicles at 1018 Summit. They what? They did not see either of the vehicles that were eventually seized at 1018 Summit. They toured around the area, went to the back of the house, didn't see either of the vehicles there. They returned to the front of the house on Summit. It was there where the officers for the first time saw the two vehicles. Now there's a difference between Detective Avila's testimony, who said that the two cars were going northbound on Summit. The other two detectives said it was either in the alley or leaving from the driveway, which was attached to the rear alley of the address. So it's unclear from the record, or there's a difference of opinion between the two detectives, or three detectives, who are all in the same car. So this isn't like they're in three separate vehicles, they have different angles. They're all in the same car. So there is a difference. Is there any similarity in their testimony? The similarity is that they didn't see anyone from that house enter either of the two vehicles. And also that the detectives were out on the front of the property at Summit when they all saw the cars for the first time. But they saw the cars leave the proximity of the residence. That depends if you believe that two unknown vehicles that are not Jeremy Green's registered car, they have not yet identified those cars as belonging to a family member of Jeremy Green. Is there two unidentified cars going northbound on a public way in a large urban area? But there's no dispute that the vehicles are both leaving the area of 1018 Summit. Either on the public way or from the alley? We do not debate that. Okay. And that within however long it took to go from the front through the alley, they weren't there at 3 in the morning. And then within that short period of time, these two vehicles are there. Correct. And we should also note that there is no evidence that either of these vehicles were anywhere near the crime scene that evening.  And I think we've covered that the seizure occurred 3 1⁄2 hours and 3 1⁄2 miles away from the crime scene. Turning to Detective Deal's own words, they stopped the minivan, quote, to check for occupants, end quote, and to, quote, know who was in the vehicles. This is the definition of a mere hunch by these officers. And Fourth Amendment law prohibits investigatory detentions when they would describe a very large category of presumably innocent travelers who would be subject to virtually random seizures. And that's not a hypothetical risk in this case. You know, we have this Monte Carlo that's also stopped. Now, the state tries to circumvent the illegal seizure here by arguing an appeal that the inevitable discovery doctrine applies. It's the state's burden to demonstrate by a preponderance of the evidence that the evidence would be inevitably discovered through lawful means. The council knows of no case, and there's none cited in the state's brief, that's held that it's inevitable that a person who is not subject to a warrant and there's no probable cause for arrest would simply wander into a police station. Here, the state's small evidence in the inevitable discovery doctrine is also tied to the illegal seizure. The state relies upon a statement that Jeremy allegedly gave to Detective Deal and his sister's comments. Those are the direct result of the illegal seizure that happened just afterwards. The state has failed to demonstrate its burden beyond a preponderance of the evidence that the inevitable discovery applies. Do you dispute that this is a Terry step? I mean, it wasn't clear to me whether you agree with the contention that it was a Terry step. I do not agree that they had reasonable suspicion to stop Jeremy Green that night. This was an illegal seizure. They did not have reasonable suspicion that Jeremy Green had committed murder that evening. They could not have stopped him. Even if they had known that Jeremy Green was in the vehicle, which we do not, the officers admit they had no idea. We do not agree that Jeremy could have been reasonably seized that evening. But there's no prior statements from family members or texts or anything that could allow them to seize him, right? Is that what you reason for yourself? The texts or voicemails that the parents said that were sent between Jeremy and Brittany do not suffice. We do not know temporal proximity to the offense. We don't know when they broke up. We don't know the nature of those. We just know from the record that there's these kind of amorphous texts or voicemails. And that is just simply not enough in this instance to have sufficed for reasonable suspicion to stop Jeremy. Had they even known that Jeremy was in the car once they did that. Okay, so you're saying, change the facts, he's walking down the street, they know that's Jeremy, they could have stopped him and asked him questions? They could not have seized him. They could have had a consensual encounter with him. But our contention is that they could not have seized him, correct? Correct. Because officers acted upon a mere hunch in illegally seizing the minivan Jeremy Green was a passenger in, the trial court erred in granting the state's motion for a directed finding on the motion to quash arrests and suppress evidence. A new trial must occur absent the illegally seized evidence. Okay, so you're saying the van, okay. At this point, the van is seized, okay, until they look in, right? The van and the passengers inside are seized. Yeah, okay, but we're talking about, they have no justification for stopping the van. Regardless, we haven't even gotten into identifying the occupants. Is that what you're saying? Because it's a van that could have gone down a public way in front of that. Correct, so there's unknown occupants, this is random vehicle traveling that's not attached to Jeremy, at least the officers don't know it's attached to Jeremy. It's not his registered vehicle, it's not registered. But you just said even if they did know it was attached to Jeremy, they couldn't stop him. Correct. Okay, because you said they couldn't, other than consensual encounter, if he was walking down the street, they couldn't stop him. Correct. Okay. What's an acceptable avenue of investigation given what the police knew? They should have gone up to the front door of 1018 Summit, they could have knocked on the door, seen, is Jeremy there? There's no probable cause, there's no reasonable suspicion, so they have to have a consensual encounter with Jeremy until they develop either reasonable suspicion or probable cause. If your honors have no further questions on the illegal seizure issue, turning to the involuntary statement issue in the briefs, there's no question that the statute 725 ILCS 5-103-2.1 was not complied with here. The state does not dispute that. So the statements that were given are presumptively inadmissible. So it's the state's burden to demonstrate by a preponderance of the evidence that the statements given in the custodial statements were voluntary and reliable. How is there a good chance? The state cannot demonstrate its burden where Jeremy's statements were the product of profane tirade by Detective Avila, the promise or the requirement of Jeremy changing his statements based on access to his family members that Detective shot and the manner in which the interrogation occurred. It was five straight hours at the hands of six separate officers. Also, the interrogation began because of an illegal seizure. Regarding the profane tirade, I suggest that the words on the brief on page 44 and 45 don't accurately convey and this court has in its hands the tape. It can do for itself the disgusting tactics that Detective Avila used here. And both those detectives admitted that they had not been trained in such a manner to use such tactics. They were not accidental. Both Detective Avila and Diehl admitted they were trying to stir up Jeremy's emotions. And then they augmented this by showing Jeremy photos of Brittany's dead body and then screaming at him to look at that. And Detective Avila and Diehl got what they wanted. They got an emotional Jeremy and a second statement out of him. This court can also look at Detective Schott's interchange regarding the family members with Jeremy. And given all the abusive and coercive behavior by the detectives here, the state simply failed to demonstrate its burden under the law that the statements were reliable and voluntary. There's no further questions, Your Honor. We ask that this court reverse Jeremy's conviction and remand for a new trial absent any illegal evidence. Any questions? Thank you, Mr. Bendick. Thank you. May I reserve the remainder of my time for rebuttal? Yes, you have five minutes. Thank you. Ms. Kelly. Good afternoon. Thank you. Will you please the court, counsel? The police were notified at approximately 1130 at night that there was an unconscious person in the park. They went there and they found Brittany Brooks's body. She had been stabbed numerous times. During the three hours initially following the finding of her body, they were in contact with her parents. They were checking their own records, going through things at the police station. They became aware that the defendant was Brittany's ex-boyfriend, that he had been sending her texts, voicemails, that he had threatened her, that there was an order of protection that Brittany had taken out against him, and they decided that that was somebody that they wanted to speak to, that they thought he might well be involved in Brittany's death or certainly would have information. When was the order of protection? I'm sorry? When was the order of protection? The date is not mentioned in the record. But it was in effect? Again. We're not sure. Right. Okay. The police then also checked their database to see what information they had on Jeremy Green, and they had the make of his car, and they had four addresses in their database that were identified with him. And so they sent police out. It's, again, not clear, as counsel mentioned, whether it seems as if they sent teams of detectives to each of the addresses or not. In any event, these three detectives went to the address at 1018 Summit. I believe that counsel perhaps added in his recitation of the facts, I believe that at least one of the detectives' deal testified that as they went around the house they did see the gray minivan parked behind. In any event, they were not there very long before they saw the gray minivan followed by the Monte Carlo leave the residence. Now it's 2.53 in the morning. Had they linked those vehicles with Jeremy? They could not tell who the occupants were. No, no. Okay, so there's no reason to believe that these vehicles belonged to or that Jeremy was in them. They thought that there was a reason to believe. They knew that these were not Jeremy's vehicles. They knew there was one vehicle registered to Jeremy, a Grand Am, and that vehicle was not there. Okay, so that's the only vehicle that... That they had associated with him. Yeah, and that was not present. That's correct. But this address was associated with him, and they saw the silver or gray Honda minivan parked behind the residence. They went around to the front, and then they saw both vehicles leave. Whether they left from behind the alley or the front, they saw both vehicles leave from this house. They'd only been there a very short time. It's still 2.53 in the morning. There was probably no other traffic in the area. And they thought it was reasonable to believe that Jeremy might well be a passenger in one of those vehicles or a driver of one of those vehicles. Okay, so it's reasonable to believe that he was a passenger. He was in one of those vehicles. They knew neither vehicle was registered to him. Even though they weren't registered to him. That's correct. I said neither vehicle was registered to him. I'm sorry. I'm having a hard time hearing you. They knew that neither vehicle was registered to him. The only vehicle that needed to be registered to him was not present. Now, opposing counsel is saying that based on this information provided by parents, that the most they could have was a consensual encounter. I disagree. Why? Because they knew there was a history of domestic disputes between the deceased and her ex-boyfriend, and they knew that the parents told them that he had been sending texts, emails, and threats, and they knew there was an order of protection between them. That he became a person. You don't know when any of those things were. Excuse me? You don't know when any of those things were. I don't know when any of those things were. Nobody asked the police officers. Don't forget this was the people made a motion at the conclusion of the defendant's evidence for a directive finding that the defendant had not made a crime of patient case, and that's what was granted in this case. Okay, but we don't know either. That's correct. That's correct. When any of these things were. The text messages, the order of protection, the threats, anything. Right. That's correct. But don't forget the police were investigating the murder in the middle of the night. They were working with whatever resources they had at hand, trying to coordinate a number of investigations that are various people. I'm still, yeah, those are a lot of facts flying around here, but let's get back to the law. They can have a consensual encounter, can they not? Certainly. Okay. What can you do to have a consensual? How far can you go to approach someone to instigate a consensual encounter? How far can you go? Yeah, I mean. Are we talking about a vehicle or a pedestrian at this point? I'm just talking conceptually. Let's go vehicle. A consensual encounter is I can talk to anyone if they're willing to stop and talk to me. If they're willing to stop. That's correct. Okay. So I'm pure of heart as a policeman. I want to have a consensual encounter with someone that some deceased person's parents said may know something about what happened. Okay. Okay? And now I'm at summit where this person I've been led to believe might be, and while I'm there I see a vehicle leave. That's correct. I'm pretty factually summarizing this, I think. And so I follow the vehicle. Yes. Can I stop that vehicle? I believe that you can. I believe that among the factors that goes into it is that it's nearly 3 o'clock in the morning, not a time when people generally leave a residence. What do I have to have? No, that's not even. I think we're getting mixed up. What do I have to have to stop a vehicle because I'd like to instigate a potential consensual encounter? It's hard to consensually stop a vehicle. Most vehicles are stopped as a terry stop, supported by reasonable articulable suspicion. That's what the people argued was present in the case. Suspicion of what? Of what? We've got to have an object. Reasonable articulable suspicion of? That an occupant of one of those vehicles may have been involved in criminal activity. Okay. A recent murder. Right. So we've got to have the object of criminal activity. That's correct. And they believe that they did. Just because one of the officers candidly testified that they did not believe they had probable cause at the time does not mean he has to turn around and state to all of his officers during the dispatch or during their meeting, by the way, we believe that there is reasonable articulable suspicion to stop the vehicle that you see leaving that residence. There's no need for the officer to have articulated that. When asked the question whether he believed at that time there was probable cause to arrest Jeremy, that is at the time before they saw the vehicles at all, he candidly answered that no, there was not. And as the trial judge found and the people argued on appeal, the reasonable articulable suspicion ripened into probable cause once the passenger gave his name as Jeremy Green and the officers saw blood on his. Okay. Yeah, the blood. Yes. Yeah. Ms. Kelly, you said that you thought that one of those cars, that one of the officers testified that one of the cars was parked. I believe that, yes, I believe that it was Diehl who testified that when they went around the house and they saw nothing initially, they went around the house. They saw the gray minivan parked in the back or even at the motion to reconsider hearing, I believe that counsel for the defense said it was a parking area, sort of like an alley parking area right behind the house, that they had seen the vehicle parked. I said that because I thought counsel in this argument today said that they didn't see the vehicles at all when they went around the house and they just could have been vehicles driving down the street. And I believe that was incorrect. And I also believe that the trial judge made the specific finding. So that's why. So there is a linkage somewhere in the evidence between the vehicle and the residence. That's correct. As opposed to just going down a public way in front of the vehicle. That's correct. I believe the record supports that. The trial judge found that. That went into the officer's decision to stop the vehicles. And the vehicles were, in fact, as it turns out, headed to the police station. And that is something that both Jeremy told the officers as soon as he was placed under arrest and that the sister testified at the hearing of the motion to suppress that he was taking them to the police station to give a statement. Who was in the other car? I don't know. There's nothing in the information. In fact, there's nothing in the record that I can recall that that car was actually stopped. It may have been. The only information we have was that Officer Rupp stopped this car and that Sergeant Green observed that as he was coming out of the police station and was the first other officer on the scene and then the detective. I don't believe the record supports what happened with the Monte Carlo. So with regard to that issue, the people would ask this court to review the trial judge's findings, which we believe are not manifestly erroneous, nor are the people trying to circumvent anything by inevitable discovery, merely trying to point out that there would be an alternative basis if, in fact, this court would disagree with the people's position. And what's the inevitable discovery that you see? That he was on his way to the police station. Taking his statement as truthful. His and his sister's and the direction of travel. He was stopped a half a block from the police station. That he would walk into the police station with blood on his shirt. Yes. He would not be the first to do that, I believe. And he had, as the evidence showed later, he had called his cousin and then his ex-brother-in-law, and then they went to the sister's house and they were discussing what to do. And they left the house and they traveled in the direction of the police station. And with regard to the second issue, as counsel mentioned, this court, of course, has the opportunity to watch the DVD as the trial judge did. The court also has the opportunity to read transcripts that were made of the recording. And then, of course, to take the evidence with regard to what went on before the recording actually started. And unless there are any questions, people would stand on the brief with regard to that second argument. How much of the statement again, or the interrogation, was the recording equipment announced? The interrogation started at 3.23 a.m. And that's the time on the Miranda warning. That's when they signed Miranda warning. And it was at 4.44 a.m. that one of the other officers, who thought he might have to go in and relieve the detectives that were doing the questioning, went to sit down and observe and realized that it had not been turned on. So it was about an hour and 20 minutes. And then it was turned on at 4.44 a.m. and then it went on until... Do you have any questions as to what took place in that hour and 40 minutes? Do I have any questions? I mean... It was, yes, well, the officers testified as to what went on at an hour and 20 minutes, and then from what went on in the following hour and 20 minutes. Which was not recorded. Which was recorded. Once it was turned on, the questions just continued. The officers doing the questioning were not told it had not been recorded. They thought it was. They thought it was recording all along. But you can tell from what followed from 4.44 to 6 o'clock in the morning as the officers repeated and said, you told us this, this can't be true. You told us this, this can't be true. And the defendant didn't deny, I told you this, I told you that. From that, the judge found that the officers' testimony with regard to what had been said, the defendant's exculpatory story during the first hour and 20 minutes, was reliable based on what occurred in the first hour and a half after the machine had been turned on. So, yes, I think the record can be reconstructed. And the trial judge found that to be reliable. Any other questions from this panel? I can't hear you. Mr. Dundek? Just a few quick points. This is de novo review on the first issue, given the fact that it was a motion for directive finding and a motion for the non-moving party. So this court is in the same steps as the trial court was. And assuming this court does find that it was an illegal stop, and since the state is serving the inevitable discovery doctrine, and we also are all in this peculiar situation where the inevitable discovery doctrine should actually be asserted once the burden has been shifted to the state that motion for directive finding and motion for hearing. So they should assert that in the court below so there could be evidence developed on that if they are actually asserting that. So that may be an alternative avenue for relief if your honors are not simply reversing it outright. If you're reversing the mandate for a new hearing for the inevitable discovery doctrine, it should be asserted by the state. And also, regarding the reasonable suspicion, whether the officers had reasonable suspicion, whether they knew Jeremy. Had they known Jeremy was in one of these vehicles, which they did not, I'd ask this court to turn to Keeper v. Hurdle. And that gives a lengthy discussion on whether there would be reasonable suspicion. We can say that in that case they found no reasonable suspicion. The case here is very similar. And those are cited in the brief as well. Turning to the second issue, the entire statement is presumed inadmissible. And so the statement is proved by the Congress otherwise that the statements are voluntary and reliable. With that, there are no further questions from your honors. Do you have any additional comments on whether or not the car was parked? Your honor, Detective Diehl testified that after they came back that the cars were parked on the property. However, Detective Avila, who is the driver of the car, testified that the cars were out front of Summit, so on the public way. Detective Schumacher gave a third version where it was just out by the rear. He didn't say it was on the property. So we actually have three versions of where these cars are at when we first see the cars having come back to the front of Summit. So I would not agree that there's any agreement in the record about the location of these cars originally when the officers saw them. And further, the trial court didn't even recite in her order, which was a motion to reconsider, didn't even recite Detective Avila's, which is the one that places the cars out on the public way and not on the 1018 Summit property. We asked in our brief that we remand for a new trial because the court had forgotten that testimony. There's no indication that the trial court had considered that in her decision. There was a simple denying of the motion originally and then the motion to reconsider was not even mentioned. That's a crucial discrepancy in this case. Well, she said something about it during the argument, so she didn't forget it. But it was not recited in the order, and it was, you know, this was a multi-day hearing. The motion to reconsider came months afterwards. It's not the fault of the evidence. She may have forgotten it. It was not in the order that was entered into the file explaining the rationale granting the state's motion to redirect the finding. If your honors have no further questions, we ask for this court to reverse Jeremy Green's conviction and remand for a new trial. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will stand in brief recess for a panel change.